IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOROTHY L. KENNEY, as Administratrix of the Estate of Patricia Ann Pollock,<br>Plaintiff,<br><br>v.<br><br>MONTGOMERY COUNTY; CORRECTIONAL MEDICAL CARE, INC.; MARGARET CARRILLO, M.D.; CHRISTINE IRVINE, R.N; MARY RHINEHART, R.N.; NURSE JOHN/JANE DOE 1; NURSE JOHN/JANE DOE 2; NURSE JOHN/JANE DOE 3; and, NURSE JOHN/JANE DOE 4,<br>Defendants. | CIVIL ACTION<br><br><br><br>NO. 13-2590 |

DuBOIS, J.  September 24, 2013

## MEMORANDUM

### I.  INTRODUCTION

This is a civil rights survival and wrongful-death action arising out of the death of Patricia Ann Pollock during a period of detention at Montgomery County Correctional Facility (MCCF). Plaintiff Dorothy L. Kenney (plaintiff) filed suit as Administratrix of the Estate of Patricia Ann Pollock against Montgomery County; Correctional Medical Care, Inc. (CMC); CMC Medical Director Dr. Margaret Carrillo; Nurses Christine Irvine and Mary Rhinehart; and four nurses whose identities are unknown, referred to in the Complaint as "Nurse[s] John/Jane Doe."[1] In the Complaint, plaintiff asserts claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution. Plaintiff also asserts state-law negligence

---

[1] The Court will identify Dr. Margaret Carrillo, Nurses Christine Irvine and Mary Rhinehart, and the four John/Jane Does as the "individual defendants," when referring to them collectively.

claims.

Presently before the Court are two motions: (1) Motion to Dismiss Plaintiff's Complaint by Defendants Montgomery County, Correctional Medical Care, Inc., Rhinehart and Irvine, and (2) Motion to Dismiss of Defendant, Margaret Carrillo, M.D. For the reasons that follow, defendants' motions to dismiss are granted in part and denied in part.

## II. FACTUAL BACKGROUND[2]

Before the Upper Moreland Township Police Department took Pollock into custody on September 22, 2011, Pollock told her mother that she was feeling ill. *Id.* ¶¶ 38-40. Upon transfer to MCCF the following day, Pollock saw defendant Nurse Doe 1. *Id.* ¶¶ 40-42. Pollock stated that she could not move her left arm and was in pain. *Id.* ¶ 42. She also noted that she had been taking clonazepam, an anti-anxiety medication, for approximately two years. *Id.* ¶¶ 41-42. Nurse Doe 1 recommended benzodiazepine-withdrawal treatment. *Id.*

Later that day, defendant Nurse Doe 2 saw Pollock, who "was reported to be yelling in her cell that she could not breathe, that she was experiencing severe chest pain, and that her chest felt 'like something [was] pressing all the way down to [her] back.'" *Id.* ¶ 43 (alterations in original). An echocardiogram revealed an abnormally elevated heart rate. *Id.* ¶ 44. These results were shared with defendant Dr. Carrillo, the CMC medical director, who was exclusively authorized to order outside treatment or testing. *Id.* ¶¶ 26, 44-45, 94. In deciding whether to order such treatment and/or testing, Dr. Carrillo considers CMC's contractual arrangement with Montgomery County, obligating CMC to fund all costs for diagnostic testing and a portion of costs for outside

---

[2] As required on a motion to dismiss, the Court takes all plausible factual allegations contained in plaintiff's Complaint to be true.

medical services.  *Id.* ¶¶ 107, 24-27.

On September 24, 2011, defendant Nurse Doe 3 assessed Ms. Pollock's vital signs and noted that Pollock's condition had deteriorated; her heart rate and breathing were rapid, and "she appeared to be weak, restless, sweating and anxious."  *Id.* ¶ 51.  Dr. Carrillo again was made aware of Pollock's condition, which was now inconsistent with benzodiazepine withdrawal.  *Id.* ¶¶ 52-53.  At midnight on September 25, 2011, Dr. Carrillo ordered, without seeing Pollock, an increased dosage of the previously prescribed benzodiazepine-withdrawal medications.  *Id.* ¶ 54.

Pollock next saw medical staff on September 26, 2011, when she "complained [to defendant Nurse Doe 4] that she had been vomiting blood, that she was suffering from rib pain and weakness, and that she could not breathe."  *Id.* ¶¶ 55-56.  Later on September 26, 2011, Dr. Carrillo examined Pollock, who "complained of feeling weak and experiencing dry heaves" and exhibited symptoms consistent with bacterial endocarditis.  *Id.* ¶¶ 57-60.  Dr. Carrillo "noted that Ms. Pollock had extensive scarring on her arms," which suggested that Pollock was an intravenous drug user and thus susceptible to bacterial endocarditis.  *Id.* ¶¶ 31-32, 59.  Dr. Carrillo ordered intravenous fluids and no diagnostic testing.  *Id.* ¶¶ 63-64.  That night, after Pollock received the fluids, Nurse Rhinehart observed Pollock "naked and wrapped in a sheet for most of the evening shift on the medical unit" and unable "to drink fluids . . . without the assistance of her cellmate."  *Id.* ¶¶ 67-68.  Nurse Rhinehart took no action.  *Id.* ¶ 69.

At 7:30 a.m. on September 27, 2011, correctional officers "observed that Ms. Pollock was in great distress and requested that CMC medical staff evaluate her."  *Id.* ¶ 70.  After examining Pollock and taking her vital signs, "Carrillo ordered that Ms. Pollock be transferred to the emergency department of Mercy Suburban Hospital."  *Id.* ¶¶ 74-76.  Upon admission to Mercy

3

Suburban Hospital, Pollock "was noted to be confused and disoriented, but she stated to medical staff that she was in great pain and that nothing had been done to alleviate that pain while she was at MCCF." *Id.* ¶ 77. Mercy Hospital physicians quickly diagnosed Pollock with massive organ failure due to "a large abscess of her tricuspid valve consistent with bacterial endocarditis." *Id.* ¶¶ 78-79. During Pollock's airlift to the Hospital of the University of Pennsylvania for immediate surgery, Pollock's heart stopped, and resuscitation efforts proved futile. *Id.* ¶¶ 78-83.

The Complaint contains three counts. Count I asserts a claim against the individual defendants under 18 U.S.C. § 1983 for deliberate indifference to Pollock's serious medical needs when they failed to pursue appropriate diagnostic testing and/or treatment although they were aware that (1) Pollock's symptoms were consistent with bacterial endocarditis; (2) Pollock was susceptible to bacterial endocarditis as a past-intravenous drug user; and (3) Pollock's symptoms were worsening and nonresponsive to the course of benzodiazepine-withdrawal treatment. Count II asserts a claim against Montgomery County and CMC under 18 U.S.C. § 1983 for (1) failing to ensure through training, supervision, discipline, or otherwise, that inmates received appropriate diagnostics and/or treatment, including necessary referrals to outside medical facilities, and for (2) incentivizing CMC and its employees to take measures to curb outside medical referrals and diagnostic testing. Count III asserts state-law negligence claims against the individual defendants for breach of their duty to comply with generally accepted medical standards of care in treating Ms. Pollock.

### III. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that, in response to a pleading, a defense of "failure to state a claim upon which relief can be granted" may be raised by

motion to dismiss. To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In *Twombly*, the Supreme Court used a "two-pronged approach" later formalized in *Iqbal*. *Iqbal*, 556 U.S. at 679; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Under this approach, a district court identifies those factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded. *Iqbal*, 556 U.S. at 679. The court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief. *Id.*

## IV. DISCUSSION

The Court first addresses each count of plaintiff's Complaint. It then turns to defendants' request that the Court strike the references to John/Jane Doe throughout the Complaint and the part of Dr. Carrillo's motion that seeks dismissal of plaintiff's punitive damages claim against her.

### A. Count I: Deliberate Indifference by Individual Defendants

Plaintiff asserts Eighth and Fourteenth Amendment claims against the individual

5

defendants. However, plaintiff claims that at the time of Pollock's injuries, Pollock was a pretrial detainee and not a convicted prisoner. The Eighth Amendment's proscription of cruel and unusual punishment does not apply until "after sentence and conviction." *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 393 n.6 (1989)); *see also Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977); *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993) ("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process [C]lause." (quoting *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987))).

Thus, claims of denial of medical treatment by pretrial detainees are "evaluate[d] . . . under the Due Process clause of the Fourteenth Amendment, which prohibits the defendants from undertaking acts that amount to punishment." *Thrower v. Alvies*, 425 F. App'x 102, 104 (3d Cir. 2011).[3] The Third Circuit has held that the "Due Process Clause provides pretrial detainees with at least as much protection as is afforded to prisoners raising denial-of-medical-treatment claims under the Eighth Amendment." *Id.* at 105.

Courts apply the Eighth Amendment standard to determine whether a pre-trial detainee's rights were violated. *See Lenhart v. Pennsylvania*, No. 13-1173, 2013 WL 2479409 (3d Cir. June 11, 2013) ("[A] pretrial detainee is not entitled to Eighth Amendment protections, but nevertheless a pretrial detainee's claim of inadequate medical care is evaluated under the same standard as a convicted prisoner's Eight Amendment claim of inadequate medical care[.]" (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003))). A prisoner must show that "(1)

---

[3] This analysis applies as well to the § 1983 claims asserted against CMC and Montgomery County.

the alleged deprivation is objectively, sufficiently serious, and (2) the defendant acted with deliberate indifference to inmate health or safety." *Thrower*, 425 F. App'x at 105 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The alleged deprivation here is sufficiently serious; the only is question is whether defendants acted with deliberate indifference to inmate health or safety. "[D]eliberate indifference" lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 837. Allegations of deliberate indifference must go beyond mere negligence or medical malpractice. *Estelle v. Gamble*, 429 U.S. 97, 110 (1976). Thus, a deliberate-indifference claim will fail unless the medical treatment received "consist[s] of acts which were either intentionally injurious, callous, grossly negligent, shocking to the conscience, unconscionable, intolerable to fundamental fairness or barbarous." *Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978).

Although mere "inadequacy or impropriety of the care . . . will not support an Eighth Amendment claim," *id.* (quoting *Roach v. Kligman*, 412 F. Supp. 521, 525 (E.D. Pa. 1976)), "[p]rison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment," *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944-45 (6th Cir. 2010) (quoting *McCarthy v. Place*, 313 Fed. App'x 810, 814 (6th Cir. 2008)). Gross negligence will support a deliberate-indifference claim, even without a showing of purpose or knowledge. *See Reed v. Cameron*, 380 F. App'x 160, 162 (3d Cir. 2010) ("Grossly negligent behavior can also constitute deliberate indifference, as can a doctor's choice to take an 'easier and less efficacious course of treatment' in response to a serious medical need." (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 2008))). The Court must examine the

claims asserted against each individual defendant separately from one another. *See Muhammad v. Schwartz*, No. 96-cv-6027, 1997 WL 43015 (E.D. Pa. Jan. 27, 1997).

### 1. Dr. Carrillo

Plaintiff alleges that Dr. Carrillo was ineffective in failing to modify her treatment plan or engage in further diagnostic efforts in the face of clear evidence that Pollock was suffering from bacterial endocarditis and not benzodiazepine withdrawal.

Physicians who fail to alter a clearly ineffective course of treatment are deliberately indifferent. For example, in *D'Agostino v. Montgomery County*, a MCCF inmate's treatment for a urinary-tract infection was not modified, even when medical personnel were on notice that that plaintiff's ailment "was not in fact a urinary tract infection" and that "plaintiff was not responding to the [prescribed] antibiotics." No. 11-cv-7728, 2012 WL 425071, at *1, *3 (E.D. Pa. Feb. 9, 2012). Denying defendants' motion to dismiss, the court held that plaintiff stated a claim for deliberate indifference by alleging that medical personnel disregarded "facts . . . clearly warrant[ing] a change in the treatment plan," including by failing to send the inmate, who was ultimately diagnosed with a spinal abscess, to the hospital until well after the inmate was wheelchair-bound and unable to lift his legs. *Id.*

Similarly, in *Shultz v. Allegheny County*, the decedent was treated for influenza, but "did not improve on her own or respond positively to the treatment made available by defendants." 835 F. Supp. 2d 14, 22 (W.D. Pa. 2011). It was only when the decedent required admission to the Intensive Care Unit that "[a]ctual testing to confirm a proper diagnosis and course of treatment . . . was provided." *Id.* Refusing to dismiss plaintiff's claims, the court held that "[t]he treatment, actions and inactions of the defendants were nonexistent or not objectively

8

reasonable." *Id.*

Here, Dr. Carrillo had been aware of Pollock's shortness of breath, severe chest pain, abnormal echocardiogram, and deteriorating condition for at least thirty-six hours before she personally saw Pollock for a diagnostic. Compl. ¶¶ 26, 45, 48, 52, 57. Further, even when Pollock had deteriorated to the point where "she had been vomiting blood, that she was suffering from rib pain and weakness, and that she could not breathe," Dr. Carrillo continued the course of benzodiazepine-withdrawal treatment and did not conduct further diagnostic testing. Compl. ¶¶ 56, 61-63. It was not until September 27, 2013, when Pollock was experiencing massive organ failure and required emergency surgery, that Dr. Carrillo referred her to the emergency room. Compl. ¶¶ 76, 79-80. Plaintiff further alleges that Dr. Carrillo did not make these decisions with regard to the serious risk to Pollock's health, but rather because she was financially motivated not to order diagnostic testing and/or refer patients for outside treatment.

These allegations are sufficient to state a claim of deliberate indifference against Dr. Carrillo. The part of Dr. Carrillo's Motion which seeks to dismiss the § 1983 claim asserted in the Complaint against her is denied.

### 2. Nurse Rhinehart

As to defendant Nurse Rhinehart, plaintiff claims that after observing Pollock unable to drink on her own and "naked and wrapped in a sheet," Nurse Rhinehart failed to provide medical care, notify Dr. Carrillo, or check Pollock's vital signs. Compl. ¶¶ 66-68. Nurse Rhinehart's argument that as a nurse, she was "not [a] policymaker[]" and "could not have sent Ms. Pollock to an outside hospital if she had wanted to," is unavailing. Defs. Montgomery County, Correctional Medical Care, Inc., Rhinehart and Irvine's Mem. of Law in Support of their Mot. to Dismiss at 24,

*Kenney v. Montgomery Cnty.*, No. 12-cv-2590 (E.D. Pa. June 11, 2013). Plaintiff does not premise the allegations against Nurse Rhinehart on the doctrine of *respondeat superior*; rather, plaintiff alleges that Nurse Rhinehart personally was involved in the events or occurrences underlying the claim. *See* Compl. ¶¶ 67-69.

Further, Nurse Rhinehart cannot rely on the argument that Dr. Carrillo bore sole responsibility for Pollock's care. When Nurse Rhinehart observed Pollock on September 26, 2011, Pollock had deteriorated markedly. Even after receiving the intravenous fluids ordered by Dr. Carrillo, Pollock was exhibiting symptoms beyond those Dr. Carrillo previously observed. Compl. ¶¶ 58, 67-68. That Dr. Carrillo had developed a treatment plan based on Pollock's less-symptomatic state is non-determinative for the purposes of evaluating the adequacy of Nurse Rhinehart's response, including her failure to notify Dr. Carrillo of Pollock's worsening condition.

These allegations are sufficient to state a claim of deliberate indifference at this stage of the litigation. The part of defendants' Motion which seeks to dismiss the § 1983 claim asserted in the Complaint against Nurse Rhinehart is denied.

### 3. Nurse Irvine

As to Nurse Irvine, plaintiff alleges only that, at one point, Nurse Irvine made a note in Pollock's file that she received ninety minutes of intravenous fluids on September 26, 2011. Compl. ¶¶ 65-66. Beyond this lone allegation, plaintiff does not detail Nurse Irvine's involvement in Pollock's care or her knowledge of Pollock's symptoms or worsening condition. Thus, as to Count I, plaintiff's § 1983 claim against Nurse Irvine is dismissed without prejudice to plaintiff's right to file an amended complaint if warranted by the facts.

## B. Count II: Montgomery County and CMC's Vicarious Liability

Montgomery County and its private contractors, including CMC, are not vicariously liable for their employees' violations. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978). They "can [only] be held liable if the constitutional violation alleged was the result of the company's or the County's own policy, procedure, or custom." *D'Agostino*, 2012 WL 425071, at *4. Plaintiff alleges that Montgomery County and CMC are liable on three grounds: (1) they "[f]ailed to establish policies, practices, and procedures to ensure that inmates at MCCF receive appropriate care for serious illnesses and, if necessary, diagnostic testing and/or outside medical services;" (2) they "[f]ailed to ensure through training, supervision and discipline that medical staff at MCCF, in necessary circumstances, conduct diagnostic testing and/or make a referral for outside medical services; and" (3) they "[e]ntered into a contractual agreement providing CMC and CMC medical staff with a strong financial disincentive to conduct diagnostic testing and/or refer inmates for outside medical services." Compl. ¶ 107.

In response, defendants first argue that plaintiff does not base the allegations on a policy or practice, which is a requirement of a *Monell* claim. Plaintiff, however, does not base the Complaint's allegations on a single instance of misconduct as defendant contends. Rather, plaintiff alleges, as detailed above, that defendants failed to develop and implement "policies, practices, and procedures," including those involving "training, supervision and discipline," that would ensure inmates received appropriate care and necessary referrals. Further, that plaintiff focuses on the effect of this policy or practice on one inmate is inconsequential. *See, e.g.*, *Johnson v. Caputo*, No. 11-cv-2603, 2013 WL 2627064 (E.D. Pa. June 12, 2013) (holding that it was "reasonable for a [single-inmate plaintiff] to conclude that the actions he complain[ed] of

11

were undertaken pursuant to some policy, procedure, or custom of at least one of the entities that controlled and implemented medical treatment at the prison"); *D'Agostino*, 2012 WL 425071, at *4.

Second, although the factual allegations supporting plaintiff's failure-to-train theory are sparse, plaintiff's allegations of "a problematic practice or policy, known to and ratified by defendants, of denying medical care for cost-saving reasons," sufficiently "elevate the Complaint, perhaps only barely, from being merely a blanket, general assertion of entitlement to relief." *Gioffre v. Cnty. of Bucks*, No. 08-cv-4232, 2009 WL 3617742, at *4 (E.D. Pa. Nov. 2, 2009). In a nearly identical case, *D'Agostino v. Montgomery County*, in which Montgomery County, CMC, and Dr. Carrillo were also defendants, Judge Rufe held that the

> allegation that . . . [Montgomery County] and CMC entered into a written contract which created a financial disincentive to meet the serious medical needs of inmates who required referrals to outside medical providers, along with the allegation that Dr. Carrillo acted pursuant to a resulting policy, practice, or custom which discouraged outside referrals, [was] sufficient to state a claim at th[e] [motion to dismiss] stage of the litigation.

2012 WL 425071, at *4. Similarly, here, plaintiff has alleged (1) that "[a]s part of its contract, CMC agreed to cover all costs, up to a limit for catastrophic cases, for inmates who required outside medical services, including hospitalization for serious illnesses," (2) that "CMC agreed to cover all costs for diagnostic testing," and (3) that "[u]nder the contract, any expenditure of funds for diagnostic testing or for an inmate requiring outside medical services would reduce CMC's annual profits." Compl. ¶ 107. Such facts are sufficiently detailed to state a claim for relief.

Finally, contrary to defendants' position, a plaintiff, in such cases, "is [not] obligated to plead with special particularity the exact policies and practices that were in place, prior to taking any discovery into [the alleged] policies, and explain exactly how these precisely alleged policies

12

caused or contributed to [plaintiff's] injuries." *Peet v. Beard*, No. 10-cv-482, 2011 WL 718723 (M.D. Pa. Jan. 25, 2011), *report and recommendation adopted*, No. 10-cv-482, 2011 WL 720192 (M.D. Pa. Feb. 22, 2011); *see also Ramos-Vazquez*, 2010 WL 3855546, at *9 ("The allegations are 'conclusory' in the sense that it is reasonable for plaintiff to conclude that the actions he complains of were undertaken pursuant to some policy, procedure or custom of at least one of the entities that controlled and implemented medical treatment at the prison. At this stage, plaintiff cannot be expected to specify and articulate which policy, procedure or custom resulted in these actions; nor should he be expected to know which entity formulated each policy."); *Johnson*, 2013 WL 2627064, at *7 (same); *Keahey v. Bethel Twp., Pa.*, No. 11-cv-7210, 2012 WL 478936 (E.D. Pa. Feb. 15, 2012) (noting that a plaintiff "cannot . . . prove . . . a pattern without a sufficient period of discovery to adduce this evidence").

Thus, the Court concludes that plaintiff has pled facts sufficient to sustain § 1983 claims against Montgomery County and CMC. Defendants' Motion to Dismiss is denied as to Count II.

### C. Count III: State-Law Negligence Claims

#### 1. Certificate of Merit

Nurses Irvine and Rhinehart argue that the Court should dismiss plaintiff's state-law medical negligence claims against them because plaintiff has not filed a certificate of merit, required under Pennsylvania Rule of Civil Procedure 1042.3.[4] Upon review of the docket, the

---

[4] Under Pennsylvania Rule of Civil Procedure 1042.3(a), "In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or

13

Court notes that plaintiff filed such certificates on July 1, 2013, within sixty days of the filing of the Complaint on May 13, 2013. Because defendants have offered no other valid basis for dismissing these claims, defendants' motions to dismiss Count III are denied.

### 2. Supplemental Jurisdiction

Under 28 U.S.C. § 1368, a district court with jurisdiction over a federal question claim may exercise supplemental jurisdiction over state-law claims "if they are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." The issue of supplemental jurisdiction is pertinent to this case because, with respect to defendant Nurse Irvine, the Court dismissed plaintiff's § 1983 claim, but not plaintiff's state-law negligence claim.

The exercise of supplemental jurisdiction is a matter of discretion rather than right. *See, e.g.*, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). This case implicates none of the concerns identified by 28 U.S.C. § 1367, which permits a court to decline to exercise supplemental jurisdiction if—

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

---

work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim."

Therefore, the Court will exercise supplemental jurisdiction over all plaintiff's state-law claims, including plaintiff's negligence claim against Nurse Irvine.

### D. John/Jane Doe Defendants

Plaintiff asserts both federal § 1983 claims and state-law negligence claims against four Nurse John/Jane Doe defendants. Defendants argue that the court should strike the references to John/Jane Doe throughout the Complaint under Federal Rule of Civil Procedure 12(f), which allows the Court to strike any "redundant, immaterial, impertinent, or scandalous matter" from the pleadings.

Contrary to defendants' contention, the Federal Rules of Civil Procedure does not bar the use of fictitious names. *See, e.g.*, *Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998) ("Doe defendants 'are routinely used as stand-ins for real parties until discovery permits the intended parties to be installed.'" (quoting *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 36 (E.D. Pa. 1990))). Accordingly, the Court denies defendants' request.

### E. Punitive Damages

Defendant Dr. Carrillo seeks dismissal of plaintiff's punitive damages claim against her on the ground that the Complaint does not allege the requisite culpable state of mind for such a claim. "A jury may 'assess punitive damages [in a civil rights action] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Alexander v. Riga*, 208 F.3d 419, 430-31 (3d Cir. 1999) (alteration in original) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836-37. The Court concludes that plaintiff has

averred deliberate indifference on the part of Dr. Carrillo.  Accordingly, the court denies that part of Dr. Carrillo's motion that seeks dismissal of plaintiff's claim of punitive damages.

## V.  CONCLUSION

The Court denies defendants' motion to dismiss with respect to all claims, excepting only plaintiff's § 1983 claim against Christine Irvine, R.N., which is dismissed without prejudice to plaintiff's right to file an amended complaint with respect to that claim within twenty days if warranted by the facts.  Because plaintiff's negligence claims "form part of the same case or controversy under Article III of the United States Constitution" as plaintiff's federal civil rights claims, the Court will exercise its supplemental jurisdiction over these state-law claims under 28 U.S.C. § 1368.  The Court declines to strike references to John/Jane Doe defendants in the Complaint.  An appropriate order follows.